**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

HOTEL 57 L.L.C.,

               Plaintiff,

    v.

INTEGRAL CONTRACTING INC.,

               Defendant.

Case No. _____

**COMPLAINT**

---

Plaintiff Hotel 57 L.L.C. ("Owner" or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against Defendant Integral Contracting Inc. ("Integral" or "Defendant") alleges as follows.

**NATURE OF ACTION**

1.      This action arises from the defective performance of a construction project related to a substantial renovation of Four Seasons Hotel New York.

2.      As the owner of the hotel, Plaintiff engaged Defendant to serve as the contractor for certain aspects of the renovation.   Plaintiff and Defendant entered into a lengthy contract that detailed the work to be performed by Defendant and imposed substantial obligations on Defendant with respect to the quality of the work and the manner in which it was to be performed.   The contract permitted Defendant to engage subcontractors to perform certain aspects of the work subject to important limitations and conditions.   Crucially, the contract provided that Defendant remained fully responsible for the work performed by its subcontractors.

3.      One portion of the work to be completed by Defendant was the replacement of the wallcovering hanging in most of the hotel's guestrooms and certain other areas.   To perform that

work, Defendant brought in a subcontractor named Paramount Painting Group, LLC.   However, Paramount performed the installation in a defective manner by cutting into (*i.e.*, scoring) the drywall on which the wallcovering was to be affixed and thus causing the drywall to fracture.   By scoring the drywall, Paramount violated the express instructions of the wallcovering manufacturer as well as industry customs and practices.   Because of the improper installation, the wallcovering began peeling away from the wall shortly after installation.

4.      Under the parties' agreement, Defendant was required to replace the defectively-installed wallpaper at its own cost if requested by Plaintiff.   Defendant, however, refused to comply when Plaintiff demanded as much.   Plaintiff thus retained a new contractor to replace the defectively-installed wallcovering at a cost of nearly $1,200,000.   Under the parties' agreement, Defendant is responsible for the defective installation of the wallcovering and the substantial harm that Plaintiff has suffered as a result.

## PARTIES

5.      Owner is a limited liability company organized under the laws of Delaware.

6.      Owner's sole member is Hotel 57 HoldCo LLC ("HoldCo"), which is a limited liability company organized under the laws of Delaware.

7.      HoldCo's members are H. Ty Warner ("Mr. Warner"), an individual, and Hotel 57 Corp. I, Inc. ("Hotel 57 Corp."), a corporation.

8.      Mr. Warner is a citizen of Illinois.

9.      Hotel 57 Corp. is a Delaware corporation and its principal place of business is located in Illinois.

10.     Integral is a corporation organized under the laws of New York and its principal place of business is located in New York.

2

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the amount in controversy between the parties exceeds $75,000.

12.     This Court has personal jurisdiction over Integral because: (1) Integral consented to the jurisdiction of this Court under Section 4.6.1 of the Agreement (as defined herein); (2) the project at issue in this litigation was performed in New York; and (3) at all times material hereto, Integral transacted business in New York.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because (a) Integral resides in this judicial district and (b) a substantial part of the events or omissions giving rise to Owner's claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.      Owner and Four Seasons Hotel New York**

14.     Owner owns the Four Seasons Hotel New York (the "Hotel").

15.     The Hotel is 52 stories tall and has approximately 368 ultra-spacious luxury suites and studios (collectively, "guestrooms").

16.     The Hotel, which opened in 1993, is located in the heart of Midtown Manhattan on "Billionaires' Row" between Park Avenue and Madison Avenue in New York, New York.

17.     The Hotel is the only hotel in the Western Hemisphere designed by the iconic architect I.M. Pei.

18.     The Hotel is renowned for its modern-deco style, high-ceilinged interiors, and French Mangy "Le Louvre" limestone exterior.

19.     The Hotel's guestrooms provide among the most spacious accommodations of any hotel in New York, averaging 500 to 600 square feet.

20.     The Hotel's guestrooms have oversized windows that provide unparalleled panoramic views of New York's iconic skyline and nearby Central Park.

21.     Each of the Hotel's guestrooms is custom designed with luxurious fabrics, stones surfaces and furnishings that remain true to I.M. Pei's modern-deco style.

22.     The Hotel's success and its status as a five-star property depend on its design and physical appearance.

**B.      The Renovation and the Retention of Integral**

23.     In 2015, Owner embarked on an extensive renovation of the Hotel that cost more than $120 million.

24.     In connection with the renovation, Owner sought to engage a highly skilled and well-qualified contractor that Owner could entrust with a substantial and costly renovation of the valuable Hotel.

25.     Integral was a contractor with more than a decade of experience.

26.     Owner identified Integral as one candidate to serve as a contractor for the renovation and engaged in discussions with Integral regarding the renovation.

27.     During the parties' discussions, Integral represented to Owner that it had the skills, personnel, and other resources and attributes necessary to satisfy Owner's needs.

28.     In reliance on Integral's purported ability to perform in a manner consistent with the high standards of the Hotel, Owner decided to retain Integral.

29.     Owner and Integral entered into an agreement (the "Agreement") dated February 12, 2016.   A true and accurate copy of the Agreement is attached hereto as Exhibit A.

30.     The Agreement provided that Integral would perform work on various aspects of the renovation of the Hotel, including: demolition, windows, bathroom marble polishing, signage, Verizon antennae relocation, HVAC, glazing, carpentry, entry doors, millwork, refinishing, faux painting, stone, drapery, fabric panels, carpet, wood floor, paint/paper, electric, and plumbing.

31.     Integral was to complete work under the Agreement in various parts of the Hotel, including guestrooms, corridors, elevator landings, and the lobby.

32.     For this work, the Agreement provided that Integral would be paid $9,824,214, subject to certain additions and deductions.   (Ex. A, Agreement, Art. 4.)

**C.     The Wallcovering Project**

33.     Owner recognized that the wallcoverings used in the Hotel were an essential aspect of the Hotel's design.

34.     As part of the renovation, Owner determined that the existing wallcovering in most of the guestrooms and certain corridors of the Hotel should be replaced.

35.     The Agreement provided that, as part of its work on the renovation, Integral was to: remove the existing wallcovering, prepare the walls for the installation of a new wallcovering to be furnished by Owner, and install the new wallcovering.

36.     Owner conducted market research, consulted with industry experts, and tested various options to identify the wallcovering that would be most suitable for the Hotel.

37.     Owner ultimately decided to use a custom silk wallcovering supplied by Jolie Papier Ltd., which was a reputable New York-based wallcovering supplier with decades of experience.

38.     Owner purchased the new wallcovering and furnished it to Integral.

39.     At no time prior to installation did Integral notify Owner that the new wallcovering was not suitable for its intended use at the Hotel.

**D.     Integral's Contractual Obligations to Owner**

40.     Article 1 of the Agreement defined "Contract Documents" to mean the Agreement and certain other documents, including drawings, specifications, and modifications issued.   (Ex. A, Agreement, Art. 1.)

41.     Section 1.1.3 of the Agreement's General Conditions provided that "Work" means "all construction and services, labor, and materials required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by [Integral] to fulfill [Integral's] obligations."   (Ex. A, Agreement's General Conditions, §1.1.3.)

42.     The Work, as that term was defined in the Agreement, included the replacement of the wallcovering at the Hotel.

43.     Article 2 of the Agreement provided that Integral "shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others."   (Ex. A, Agreement, Art. 2.)

44.     The Agreement provided that Integral shall be in control of and have responsibility for the Work.   For instance, Section 3.3.1 of the Agreement's General Conditions expressly stated that, unless otherwise specified in the Contract Documents, Integral "shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work."   (Ex. A, Agreement's General Conditions, §3.3.1.) Relatedly, Section 4.2.3 provided that Owner "will not have control over or charge of and will not

be responsible for acts or omissions of [Integral], Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work." (*Id.* § 4.2.3.)

45.    The Agreement imposed various obligations on Integral to ensure that the Work was performed with sufficient skill and attention by appropriately qualified workmen in accordance with demanding quality standards.

46.    Section 3.3.1 of the Agreement's General Conditions obligated Integral to "supervise and direct the Work, using [Integral's] best skill and attention." (Ex. A, Agreement's General Conditions, §3.3.1.)

47.    Section 3.4.1 of the Agreement's General Conditions obligated Integral to "enforce strict discipline and good order among . . . persons carrying out the Work" and to "not permit employment of unfit persons or persons not properly skilled in tasks assigned to them." (Ex. A, Agreement's General Conditions, §3.4.3.)

48.    Section 3.5.1 of the Agreement's General Condition provided several crucial warranties to the Owner related to Integral's performance of Work under the Agreement. (Ex. A, Agreement's General Conditions, §3.5.1.)

49.    First, Integral warranted that "the Work will be performed in a skillful and workmanlike manner, free from defects not inherent in the quality required or permitted." (Ex. A, Agreement's General Conditions, §3.5.1.)

50.    Second, Integral warranted that "all materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents." (Ex. A, Agreement's General Conditions, §3.5.1.)

51.    Third, Integral warranted that the "Work will conform to the requirements of the Contract Documents." (Ex. A, Agreement's General Conditions, §3.5.1.)

52.     Section 3.5.1 provided that any Work that did not conform to these warranties "may be considered defective."   (Ex. A, Agreement's General Conditions, §3.5.1.)

53.     Section 8.6.3 of the Agreement provided, in part, that "[Integral] shall indemnify . . . and hold harmless" Owner "from and against any and all claims, losses, liability, damages, judgments, fines, penalties and costs of any nature (including, without limitation, reasonable attorneys fees and expenses), arising out of or in connection with, in whole or in part, the [Integral's] performance of the Work and/or the [Integral's] breach of this Agreement . . . ." (Agreement, § 8.6.3.)

54.     The obligations imposed on Integral by the above-cited sections, as well as other provisions of the Agreement, provided essential protections to Owner in connection with Integral's performance of the Work.

**E.     Integral's Retention of a Wallcovering Subcontractor**

55.     When negotiating the Agreement, Owner and Integral contemplated that, under some circumstances, it might make sense for Integral to retain a subcontractor to complete some of the Work.

56.     The Agreement permitted Integral to retain subcontractors but imposed certain limitations and conditions in the event that Integral did so.

57.     The limitations and conditions were intended to ensure that the retention of a subcontractor did not impair Owner's interests or reduce Integral's obligations to Owner.

58.     Several categories of limitations and conditions are particularly noteworthy.

59.     First, the Agreement provided that Integral was responsible to Owner for the Work performed by Integral's subcontractors.   For instance, Section 3.3.2 of the Agreement's General Conditions provided that "[Integral] shall be responsible to the Owner for acts and omissions of

[Integral's] . . . Subcontractors and their agents and employees . . . performing portions of the Work for or on behalf of [Integral.]"   (Ex. A, Agreement's General Conditions, § 3.3.2.) Likewise, Section 5.3.1 of the Agreement's General Conditions provide: "No subcontracting of any of the Work shall relieve the Contractor from its responsibility under the Contract Documents, including for performance of the Work."   (Ex. A, Agreement's General Conditions, § 5.3.1.)

60.    Second, the Agreement imposed various obligations on Integral to examine, inspect, and monitor inspect work performed by subcontractors to ensure the Work was performed in accordance with the requirements and standards imposed by the Agreement.  (*E.g.,* Ex. A, Agreement's General Conditions, §§ 3.3.1, 3.3.4.)

61.    Third, the Agreement imposed detailed obligations on Integral with respect to the terms of its subcontracts that were intended to ensure Integral's relationships with subcontractors were structured in a manner that provided sufficient protections to Owner's interests.  (*E.g.*, Ex. A, Agreement's General Conditions, § 5.3.1.)

62.    Integral decided to retain a subcontractor to complete the replacement of the wallcovering at the Hotel.

63.    Owner relied upon Integral to select a subcontractor that had the skills, personnel, and other resources and attributes necessary to properly perform the replacement of the wallcovering.

64.    Integral ultimately engaged Paramount Painting Group, LLC ("Paramount") to perform, among other work, the replacement of the wallcovering.

65.    Paramount was a "Subcontractor" as that term is defined in Section 5.1.1 of the Agreement's General Conditions.

66.     Integral and Paramount entered into a Subcontractor Purchase Order dated June 9, 2016 ("Paramount Subcontractor Purchase Order").   A true and correct copy of the Paramount Subcontractor Purchase Order is attached hereto as Exhibit B.

67.     Integral did not provide a copy of the Paramount Subcontractor Purchase Order to Owner at the time of contracting.

68.     As Owner only later discovered when Integral finally provided a copy, the Paramount Subcontractor Purchase Order did not include the provisions and protections required under Section 5.3.1 of the Agreement's General Conditions.

69.     Thus, the Paramount Subcontractor Purchase Order needlessly and improperly impaired Owner's interests and exposed Owner to additional risk in the event Paramount performed defectively.

**F.      The Replacement of the Wallcovering**

70.     In replacing the wallcovering, Paramount acted under the direction and control of Integral as the contractor under the Agreement.

71.     The Agreement and the Contract Documents required Paramount and Integral to complete several steps to replace the wallcovering.

72.     First, the existing wallcovering had to be removed.

73.     Second, the walls and ceilings had to be prepared to receive the new wallcovering.

74.     In at least certain areas of the Hotel, the preparation included applying a "skim coat" to the walls and ceilings.

75.     A skim coat is a thin application of joint or drywall compound.

76.     A skim coat smooths out new and/or imperfect surfaces and provides a smooth and suitable surface for the application of primer and the installation of the wallcovering.

10

77.     The preparation also included the application of primer.

78.     Primer serves various functions in the installation of wallcoverings including: (1) sealing the surface to which the wallcovering will be affixed; (2) presenting a proper surface for the wallcovering adhesive to attach to; and (3) reducing the difficulty of removing the wallcovering in the future.

79.     For walls and ceilings in the Hotel with a skim coat layer, primer was to be applied to the skim coat layer.

80.     For walls and ceilings in the Hotel without a skim coat layer, primer was to be applied directly to the surface of the walls and ceilings.

81.     Third, the new wallcovering, which had been furnished by Owner and was provided to Paramount by Integral, had to be installed.

82.     The process of installing wallcovering involved, among other work: applying adhesive to the surface to which the wallcovering is to be affixed, cutting the wallcovering into pieces suitable for installation, and hanging the wallcovering.

83.     In and around June and July of 2017, Integral and Paramount replaced the wallcovering in approximately 328 guestrooms and certain corridors of the Hotel.

**G.     The Delamination of the Wallcovering**

84.     In approximately mid-July 2017, Owner learned that the wallcovering installed by Integral and Paramount was peeling away from the walls and ceilings.

85.     Such peeling away is customarily referred to as "delamination" in the wallcovering industry.

86.     As depicted in Figure 1 below, delamination occurred primarily at the seams where two pieces of wallcovering met.



*Figure 1*

87.     Delaminated wallcovering is customarily recognized as aesthetically unpleasing and defective in the wallcovering industry.

88.     Owner was very concerned upon the discovery of the delamination as the Hotel's status as a five-star property and its market standing depended on its design and physical appearance.

89.     Owner promptly notified Integral in writing of the delamination of the wallcovering.

90.     Integral acknowledged that delamination of the wallcovering was problematic and assured Owner that it would undertake appropriate steps to rectify the delamination.

91.     In the days, weeks, and months following the initial discovery of delamination in the first affected areas of the Hotel, the wallcovering in other guestrooms and corridors began to delaminate as well.

92.     Delamination became widespread throughout the guestrooms and corridors where Integral and Paramount had installed wallcovering.

93.     The delamination caused substantial harm to Owner and the Hotel.

94.     The delamination degraded the physical appearance of the Hotel and imperiled the Hotel's reputation and market standing.

95.     Affected guestrooms had to be taken out of services because of the delamination and related remediation efforts.

96.     Owner had to pay for expenses involved in efforts to identify, assess, and remediate (at least on a temporary basis) the delamination.

97.     Owner and the Hotel's staff had to dedicate substantial time and resources to identifying, assessing, and attempting to remediate the delamination.

**H.     The Cause of the Delamination**

98.     Although Integral assured Owner it would investigate and remedy the delamination, Integral instead attempted to evade responsibility.

99.     Integral repeatedly purported to identify causes for the delamination that it claimed were the fault of Owner.

100.    As each purported cause identified by Integral was revealed to be incorrect and indefensible, Integral simply developed new theories to shift blame to Owner.

101.     Only through its own efforts did Owner ultimately discover that the negligent and defective installation of the wallcovering by Integral and Paramount was responsible for the delamination.

102.     As Owner learned, Paramount "double-cut" the wallcovering during the installation process.

103.     Double-cutting refers to a process in which the edges of two pieces of wallcovering are overlapped and then cut through with a knife or other sharp device.

104.     The purpose of double-cutting is to achieve perfectly matched edges and create a seamless appearance when the wallcovering is hung.

105.     If properly performed, double-cutting does not cause delamination.

106.     However, Paramount performed the double-cutting while the wallcovering was suspended on the surface where it would be affixed and without protecting the underlying surface from the blade used to cut the wallcovering.

107.     Consequently, Paramount cut through the wallcovering and into the skim coat and drywall behind it.

108.     This process, which is commonly referred to as scoring the drywall, caused the drywall to fracture.

109.     Due to the fracturing and the resulting break in the adhesive chain, the wallcovering peeled away from the wall at the site of the scoring.

110.     It is commonly recognized in the wallcovering industry that it is improper to score drywall when installing wallcovering.

111.    The hanging instructions provided by the manufacturer of the wallcovering furnished by Owner expressly stated that the drywall must not be scored during the installation process.

112.    It is commonly recognized in the wallcovering industry that scoring drywall causes the surface to become unstable and leads to delamination.

113.    There are readily available tools that are customarily used when double-cutting wallcovering to protect underlying drywall from scoring.

114.    Paramount did not properly use any such tool when installing wallcovering at the Hotel.

115.    Moreover, there are installation techniques that can be used to prevent the scoring of drywall when installing wallcovering, including by cutting the wallcovering on a surface other than the surface to which it will be affixed.

116.    Paramount did not properly use any such installation techniques when installing wallcovering at the Hotel.

117.    By installing the wallcovering in a manner that resulted in the scoring of the drywall, Paramount acted in a manner that was inconsistent with the obligations imposed by the Agreement, negligent, and contrary to industry customs and practices.

118.    The improper installation of the wallcovering caused property damage to the Hotel, including the wallcovering and the drywall.

119.    Under the terms of the Agreement, Integral is responsible for the defective work performed by Paramount.

120.    Integral's retention and management of Paramount further breached the Agreement because: (1) Integral did not supervise and direct the work performed by Paramount with Integral's

best skill and attention; (2) Integral did not enforce strict discipline and good order among the persons carrying out the replacement of the wallcovering; and (3) Paramount was neither fit to nor had the necessary skills to carry out the replacement of the wallcovering.

## I.   Integral's Refusal to Replace the Defectively-Installed Wallcovering

121.   Although efforts were made to remediate the delamination without replacing the wallcovering, such efforts proved unsuccessful.

122.   To remedy the delamination, Owner had to start over from scratch and have the wallcovering replaced.

123.   To complete the replacement, the defectively-installed wallcovering had to be removed and disposed of, replacement wallcovering had to be purchased, the surfaces in the Hotel had to be prepared again, and the replacement wallcovering had to be hung.

124.   Owner ultimately decided that the defectively-installed wallcovering should be replaced to prevent further harm to the Hotel and to ensure that the affected portions of the Hotel could resume normal operations.

125.   Under the Agreement, Owner had the right to require Integral to replace the wallcovering at no cost to Owner.

126.   Section 3.5.1 of the Agreement's General Conditions provided, in part, that "[Integral], at its own cost, shall be responsible for promptly repairing or replacing the Work required pursuant to any breach of the foregoing warranty" set forth in Section 3.5.1 upon notification by Owner.   (Ex. A, Agreement's General Conditions, § 3.5.1.)

127.   Section 12.2.2.1 likewise imposed on Integral an obligation to "correct . . . promptly" Work "that is found to be not in accordance with the requirements of the Contract Documents" upon notification by Owner.   (Ex. A, Agreement's General Conditions, § 12.2.2.1.)

128.    Owner requested on multiple occasions in writing that Integral replace the defectively-installed wallcovering, at Integral's own cost, as required under the Agreement.

129.    However, Integral refused to replace the wallcovering at its own cost.

130.    Integral instead conditioned any replacement of the wallcovering on the payment by Owner of the costs of replacement.

131.    In a proposal submitted on August 9, 2018, Integral estimated its costs to replace the wallcovering would total $965,681.

132.    Owner did not accept Integral's unilateral attempt to rewrite the parties' Agreement by reallocating the responsibility to cover the costs of replacement to Owner.

**J.    Owner's Replacement of the Defectively-Installed Wallcovering**

133.    Under Sections 2.4 and 6.1 of the Agreement's General Conditions, Owner had the right to retain a contractor other than Integral to replace the defectively-installed wallcovering.

134.    In the event Owner elected that option, the Agreement obligated Integral to pay Owner for the costs incurred in the replacement.   (*E.g.*, Ex. A, Agreement's General Conditions, § 6.2.3.) ("The Owner shall be reimbursed by [Integral] for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of [Integral].").

135.    Considering Integral's and Paramount's defective installation of the wallcovering, Integral's disregard for its contractual obligations to Owner, and Integral's refusal to bear the cost of replacement, Owner decided that Integral was not a suitable contractor to complete the replacement of the wallcovering.

136.    On or about September 25, 2019, Owner sent a letter to Integral providing notice that Owner intended to order replacement wallcovering and retain a different, qualified firm to

install the replacement wallcovering.  Owner further stated in the letter that Integral would be liable for the entire amount spent by Owner to complete the replacement of the wallcovering.

137.    Integral did not inform Owner of any objection to the retention of another contractor to replace the wallcovering.

138.    On approximately November 19, 2021, Owner entered into a contract for the replacement of the wallcovering with NewGen Painting Inc. ("NewGen Painting").

139.    NewGen Painting was a contractor specializing in commercial, retail, and residential wallcovering and painting and was well-qualified to perform the replacement of the wallcovering.

140.    Pursuant to the November 19th contract, NewGen Painting removed the defectively-installed wallcovering, furnished replacement custom silk wallcovering provided by Jolie Papier, Ltd., and installed the replacement wallcovering.

141.    NewGen's efforts to replace the defectively-installed wallcovering necessarily interfered with the normal operations of the Hotel as (a) Hotel staff and Owner were required to dedicate resources to coordinating and facilitating the replacement and (b) certain areas of the Hotel had to be closed to guests.

142.    Owner paid $1,195,813.73 to NewGen for the replacement of the defectively-installed wallcovering.

143.    The replacement wallcovering installed by NewGen has not delaminated.

**K.**    **Owner's Entitlement to Contractual Interest**

144.    Section 13.6.1 of the Agreement's General Conditions addresses the accrual of interests on overdue payments under the Agreement.

145.     In particular, Section 13.6.1 provides that "[p]ayments due and unpaid under the Contract Documents for a period of thirty (30) days beyond the due date under the Contract Documents shall bear interest from the date payment is due at a rate of four percent (4%) per annum."  (Ex. A, Agreement's General Conditions, § 13.6.1.)

146.     Under the Agreement, Integral was obligated to pay Owner for the costs Owner incurred because of either the defective installation of the wallcovering by Integral and Paramount or the installation of the replacement wallcovering by NewGen.

147.     Those amounts were due more than 30 days ago and have not been paid by Integral.

148.     Owner thus is entitled to contractual interest under the Agreement.

**L.     <u>Owner's Entitlement to Attorneys' Fees</u>**

149.     Section 8.6.1 of the Agreement contains an attorneys' fees provision.

150.     That section provides, in part, that "[i]n the event that either the Owner or the Contractor becomes a party to any litigation . . . against the other to enforce their respective rights or interests under this Agreement, and such party shall prevail, the losing party shall reimburse the other for costs and expenses, including, without limitation, all reasonable attorneys' fees incurred by the prevailing party in connection with such litigation as determined by the Court . . . ."  (Ex. A, Agreement, § 8.6.1.)

151.     Consequently, if Owner prevails in this litigation, it is entitled to recover the costs and expenses of this litigation from Integral.

**<u>COUNT I</u>**

**BREACH OF CONTRACT**

152.     Owner incorporates by reference the allegations in the foregoing paragraphs.

153.     The Agreement is a valid and enforceable contract.

154.     Owner materially performed all obligations required of it under the Agreement.

155.     Integral breached the Agreement in connection with the negligent and defective installation of the wallcovering at the Hotel and related remediation and replacement efforts.

156.     As a result of Integral's breaches of the Agreement, Owner has suffered damages in excess of $1,219,813.73, plus interest, attorneys' fees, and costs.

**COUNT II**

**CONTRACTUAL INDEMNIFICATION**

157.     Owner incorporates by reference the allegations in the foregoing paragraphs.

158.     In the Agreement, Integral expressly agreed to indemnify and hold Owner harmless from and against any and all claims, losses, liability, damages, judgments, fines, penalties and costs of any nature (including, without limitation, reasonable attorneys' fees and expenses), arising out of or in connection with, in whole or in part, Integral's performance of the Work and/or Integral's breach of the Agreement.

159.     The defective installation of the wallcovering, the delamination of the wallcovering, and the efforts to remediate the delamination and replace the defectively-installed wallcovering arose out of or in connection with Integral's performance of the Work or Integral's breach of the Agreement.

160.     The defective installation of the wallcovering, the delamination of the wallcovering, and the efforts to remediate the delamination and replace the defectively-installed wallcovering have caused Owner to suffer claims, losses, liability, damages, judgments, fines, penalties or costs (including, without limitation, reasonable attorneys' fees and expenses).

161.     Integral has refused to indemnify or hold Owner harmless in breach of Integral's obligations under the Agreement.

162.     Because of Integral's breach of its obligation to indemnity and hold Owner harmless, Owner has suffered substantial damages in excess of $1,219,813.73, plus interest, attorneys' fees, and costs.

## COUNT III

## NEGLIGENCE

163.     Owner incorporates by reference the allegations in the foregoing paragraphs.

164.     As the contractor for the replacement of the wallcovering, Integral owed a duty to Owner to exercise reasonable care and skill in the performance of the work.

165.     As the contractor for the replacement of the wallcovering, Integral owed a duty to Owner to exercise reasonable care and skill in Integral's retention, direction, supervision, and monitoring of Paramount in connection with the replacement of the wallcovering.

166.     As the contractor for the replacement of the wallcovering, Integral owed a duty to Owner to complete the replacement of the wallcovering in a good and workmanlike manner free of faulty workmanship and materials.

167.     As the contractor for the replacement of the wallcovering, Integral owed a duty to Owner to exercise reasonable care and skill in the remediation of the delamination.

168.     In breach of its duties, Integral committed careless and negligent acts and/or omissions resulting in the delamination of the wallcovering.

169.     Integral's negligence caused construction defects and property damage to the Hotel, including damage to the drywall and damage to the defectively installed wallcovering, and deprived Owner of the use of the guestrooms and other areas of the Hotel affected by the delamination.

170.    As a direct and proximate result of Integral's negligence, Owner has suffered substantial damages in excess of $1,000,000, including property damage to the drywall, property damage to the defectively installed wallcovering, and deprivation of use of areas of the Hotel affected by the delamination.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Hotel 57 L.L.C. respectfully prays that this Court:

a.      award Owner compensatory damages, including for the expenses that Owner incurred to remediate the delamination and to replace the defectively-installed wallcovering;

b.      award Owner prejudgment contractual and/or statutory interest;

c.      award Owner post-judgement interest;

d.      award Owner the costs of this suit, including Owner's attorneys' fees;

e.      award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Hotel 57 L.L.C. demands a trial by jury on all issues so triable.

Dated: March 29, 2022                    Respectfully submitted,

                                                 Hotel 57 L.L.C.

                                                 By: _____
                                                 Craig Bolton
                                                 GOLDSTEIN & MCCLINTOCK LLLP
                                                 One World Trade Center
                                                 Suite 8500
                                                 New York, NY 10007
                                                 Phone: (646) 893-0459
                                                 Email: craigb@goldmclaw.com

                                                 Gregory J. Scandaglia (*pro hac vice* motion
                                                 forthcoming)
                                                 Joseph R. Swee (*pro hac vice* motion forthcoming)
                                                 SCANDAGLIA RYAN LLP
                                                 55 E. Monroe Street, Suite 3440
                                                 Chicago, IL 60603
                                                 Phone: (312) 580-2020
                                                 Fax: (312) 782-3806
                                                 Email: gscandaglia@scandagliaryan.com
                                                                jswee@scandagliaryan.com

                                                 *Counsel for Plaintiff Hotel 57 L.L.C.*